The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
This case was heard before Deputy Commissioner Dollar in Greensboro on May 9, 1994. Following the hearing, the depositions of Carol M. Schiller and James Callies were submitted into evidence. All objections raised therein are ruled upon in accordance with the law and this Opinion and Award. Thereafter, the parties stipulated 14 pages of medical reports from Forsyth Memorial Hospital and Dr. Paul Gwyn into evidence.
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing as:
STIPULATIONS
1. All parties hereto are subject to and bound by the provisions of the North Carolina Workers' Compensation Act and the employment relationship existed between the parties at all relevant times.
2. Crum Forster was the carrier on the risk.
3. On March 5, 1993, the plaintiff injured her hand while working as a machine operator at Kay Chemical Company.
4. The plaintiff's average weekly wage was $395.00, which yields a weekly compensation rate of $263.35.
5. The issue for determination is whether plaintiff's claim for benefits for a work-related injury may be denied pursuant to N.C. GEN. STAT. § 97-12.
6. At the hearing, the following exhibits were received into evidence:
 a. Plaintiff's Exhibit 1, Postcard to Plaintiff from defendant-carrier; and
b. Plaintiff's Exhibit 2, 11 pages transcript of recorded statement.
* * * * * * * * * * * * * *
Based upon all the competent evidence adduced from the record, the Full Commission makes the following:
FINDINGS OF FACT
1. At the time of the injury giving rise to this claim, the plaintiff was a 23 year old female who was a high school graduate. The plaintiff was married and the mother of three children.
2. The plaintiff began working for defendant on July 30, 1990 as a machine operator.
3. The manufacturing involves the packaging of cleaning solutions in plastic bags which are double sealed with use of a circle machine. The machine fills four plastic bags, fed through tubes, the plastic is fed off parallel rollers into the machine, and heat seals which are at approximately 400 degrees Fahrenheit are used to double seal the plastic. The machine is staffed with one operator and two packers, and employees wear gloves to protect against the heat and chemicals.
4. During the night from March 4 to March 5, 1993, the plaintiff was up and caring for a very sick baby, who was diagnosed the next day with pneumonia. The plaintiff was extremely worried about the fact that her baby was having difficulty breathing and she got very little sleep that night. (Tr. pp. 31-32). In spite of her exhaustion, the plaintiff intended to work on Friday, March 5, even though it was her scheduled day off. She had volunteered to work the overtime. (Tr. p. 37). Early in the morning, Virgie Riley, a friend and coworker, picked the plaintiff up to take her to work. (Tr. p. 32). During that car ride to work, plaintiff's behavior was normal and she ingested no drugs. Riley also testified that the plaintiff seemed tired and quite worried about her sick child. (Tr. pp. 123-24).
5. At work, the plaintiff obtained a new pair of cotton gloves from her supervisor to protect her hands from the extreme heat of the circle machine and went to her work station. (Tr. p. 32). The plaintiff testified, and her supervisor, Klay Kreichbaum, confirmed that, as always, she obtained the gloves he had available, with no attention to their particular size. (Tr. pp. 34, 90-91, 135). This particular pair of gloves was too large for plaintiff, and the fingers of the gloves extended beyond the tips of her fingers. (Tr. pp. 34, 90).
6. The company had removed the guards that should have covered the cross seal and rollers and had provided a guard override mechanism, making it possible to rethread the machine while it was running. (Tr. pp. 22-27).
7. Machine operators were encouraged to keep their machines running as much as possible to meet their production quotas. (Tr. p. 18, 119). Therefore, it was not unusual and was, in fact, quite common for the machine operators to rethread the machine while it was running. (Tr. pp. 19-20, 95-96, 118, 125). Indeed, the removal and override of the guards that would have prevented this maneuver itself demonstrates the company's tacit approval of rethreading the machine while it was running. (Tr. pp. 22-27).
8. On March 5, 1993, while attempting to rethread the machine in the same manner that she and many other, if not all, employees used to rethread the circle machine while it was running, the plaintiff reached between two sets of rollers to manually feed the plastic through the rollers. While doing so, the plaintiff apparently put her gloved right hand too close to the bottom set of rollers. When she did so, the overly long fingertips of her gloves were accidentally pulled into the rollers, and the first joints of her index and middle fingers were crushed and amputated between the rollers. Reacting very quickly, she pulled her hand back out of the rollers, thereby probably saving her other fingers and her hand from much more extensive damage. (Tr. pp. 32-35, 103-04).
9. The plaintiff and her coworkers, Riley, Boyles and Tate, had each rethreaded the machine while it was running many, many times, and indeed performed that same maneuver — placing their hand between the rollers to manually feed the plastic film — each and every day and probably more than once each day. (Tr. pp. 21, 95-96, 118-19, 125). The plaintiff herself had done so more than 100 times during her three years of employment at Kay Chemical. (Tr. p. 81).
10. The plaintiff was taken by ambulance to Forsyth Memorial Hospital emergency room. Upon request of defendant-employer, plaintiff agreed to be drug tested.
11. From the hospital, the plaintiff and her mother went to the offices of Dr. Paul Gwyn, a plastic surgeon, who performed the surgery necessary to repair the damage and to begin the healing process. Dr. Gwyn inserted the plaintiff's fingers into her side. (Tr. p. 44). Thereafter, the plaintiff began a recovery process that still is not complete. Dr. Gwyn has recommended further surgery to eliminate some of the pain the plaintiff still has and to improve the appearance of her fingers. (Tr. pp. 52-54; Tr. Exh. pp. 16, 18).
12. The plaintiff's drug test was performed by the Nichols Institute Substance Abuse Laboratories, and on March 26, 1993, the defendant-employer was advised that plaintiff had tested positive for marijuana metabolites. The plaintiff was terminated on March 30, 1993 for violating defendant's drug and alcohol policy.
13. Specifically, the drug screening disclosed a level of marijuana metabolites in plaintiff's urine of 237 nanograms per milliliter.
14. The plaintiff admitted that she had used marijuana in the past; however, she denied that she had used marijuana the morning of the injury or the evening prior to the injury, she stated that she may have had one or two drags off of one marijuana cigarette the weekend before the accident.
15. Toxicologist Carol Schiller offered expert testimony that it was not scientifically possible for an individual to have smoked one cigarette at any time on the weekend before the accident in order to maintain a level of 237 nanograms per milliliter on Friday. Dr. Schiller gave an opinion that in order for plaintiff to have retained this level several days after smoking the drug, the plaintiff would have had to smoke in excess of 20 marijuana cigarettes on Sunday.
16. Authoritative toxicological studies have shown that smoking one marijuana cigarette will produce between 74 nanograms per milliliter and 607 nanograms per milliliter in a person's urine when tested after zero to eight hours.
17. James A. Callies, Director of Lab Operations with Nichols, testified by deposition to establish the chain of custody of the urine sample and the test results, and he noted that the level of marijuana found in plaintiff's urine indicated that she had recently used marijuana in the past. However, Mr. Callies stated that the test results were not such that the 237 nanograms per milliliter could be equated to impairment.
18. Dr. Schiller gave an opinion that the level of exposure was a significant exposure which indicated either that exposure was extremely high and a long time before it was measured or was lower and more recent. Toxicologically, Dr. Schiller gave an opinion that plaintiff was intoxicated because her level was 237 nanograms per milliliter. Very significantly, although Schiller was pressed for an answer twice, she was unable to equate her opinion that the plaintiff was "intoxicated" with a related inability to properly operate her machine, and she was unwilling to express an opinion as to whether or not the plaintiff was impaired:
 Q. Am I correct in saying that you do not have an opinion as to whether she was impaired at the time of her accident?
 A. Okay, my question to you was, what did you mean by `impaired'?
 Q. Unable to properly operate her machine is what I mean by impaired.
A. I don't know that.
 Q. You do not have an opinion as to whether she was impaired by marijuana at the time of her accident such that that impairment caused her accident?
 A. Well, I thought you defined impairment as an inability to operate her machine.
Q. Properly.
A. And you are defining those two as the same?
Q. Yes.
A. Okay, I don't have an opinion.
Schiller dep. p. 46 (emphasis added).
19. Neither Dr. Schiller nor Mr. Callies were able to say whether or not plaintiff was under the influence of marijuana or impaired by marijuana at the time or the accident nor were they able to say that use of marijuana was a proximate cause of the accident. As can be seen from Callies' testimony, the urinary metabolite measured by his test only measures a non- psychoactive metabolite, thus it cannot be related to impairment no matter what its level or when it was used. Additionally, Callies stated quite specifically that it is impossible to say when a person used marijuana based on the urinary metabolite test and that it is impossible to determine whether or not someone is impaired when the test was taken:
 Q. When testing for 9-Carboxy-THC, which is what you did, am I correct in saying that it is impossible to determine when the marijuana that produced that urinary metabolite later was used?
Ms. Perkowski: Objection.
 A. (By the Witness) That is correct. It is impossible to determine the exact time.
 Q. Am I correct in saying that it is impossible to determine from your test whether someone is or is not impaired at the time the test was taken?
A. That is correct.
 Q. Am I correct in saying that the major shortcoming of urine as a specimen source is the inability of its testing to show how recently a person used the drug or was exposed to the drug?
 A. Well, that is one shortcoming if that is what you are attempting. . . If that is the information that is being desired. then urine drug testing will not be able to provide that information. That is true.
Callies dep. p. 25 (emphasis added).
* * * * * * * * * * * * * *
The foregoing findings of fact engender the following:
CONCLUSIONS OF LAW
1. The plaintiff sustained an injury by accident arising out of and in the course of her employment on March 5, 1993. N.C. GEN. STAT. § 97-2(6).
2. Pursuant to N.C. GEN. STAT. § 97-12(2), no compensation shall be payable if the injury to the employee was proximately caused by being under the influence of any controlled substance listed in the North Carolina Controlled Substances Act, N.C. GEN. STAT. § 90-86, et. seq. The burden of proof is upon the party who claims an exemption under this section.
3. In asserting the defense set forth in N.C. GEN. STAT. § 97-12, the defendant-employer is required to prove (1) that the employee was under the influence of a controlled substance at the time of the accidental injury and (2) that being under the influence of a controlled substance at the time of the accidental injury was a proximate cause of the accidental injury. In this case the defendant-employer proved neither.
* * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Plaintiff's claim for benefits for a work-related injury cannot be denied pursuant to N.C. GEN. STAT. § 97-12(2) and the Full Commission finds as a fact and concludes as a matter of law that the 5 March 1993 accidental injury of plaintiff is compensable under the North Carolina Workers' Compensation Act.
2. Defendants shall pay all medical expenses growing out of the accidental injury of 5 March 1993 to the extent that the same shall tend to effect a cure, give relief or lessen the period of disability.
3. Defendants shall pay to plaintiff compensation at the rate of $263.35 for all weeks during which plaintiff was unable to work because of the injury, subject to attorney's fees of 25% of the compensation due or paid, which shall be paid to plaintiff's attorney. If the parties are unable to agree upon the period of disability, if the parties are unable to agree upon the rating resulting from the injury, or if the parties are unable to agree upon any other matter properly raised under the North Carolina Workers' Compensation Act, they can have such matter determined by filing a Form 33 with the Commission.
4. Defendants shall pay the costs, including an expert witness fee of $75.00 to James Callies and $120.00 to Carol M. Schiller.
 S/ ________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ________________________ COY M. VANCE COMMISSIONER
DISSENTING:
S/ ________________________ DIANNE C. SELLERS COMMISSIONER